IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

DAVID M. THOMPSON, JR.,            )    CIVIL NO. 11-00638 LEK-RLP
                                   )
          Plaintiff,               )
                                   )
     vs.                           )
                                   )
CRANE COMPANY, ET AL.,             )
                                   )
          Defendants.              )
_____   )

## ORDER DENYING PLAINTIFF'S MOTION TO REMAND

Before the Court is Plaintiff David M. Thompson, Jr.'s ("Plaintiff") Motion to Remand ("Motion"), filed on November 10, 2011. [Dkt. no. 28.]  Defendant IMO Industries, Inc. ("IMO") filed its Memorandum in Opposition on February 6, 2012; [dkt. no. 54;] Defendant Crane Co. ("Crane") filed its Memorandum in Opposition on February 6, 2012; [dkt. no. 55;] Defendant Air & Liquid Systems Corporation, successor by merger to Buffalo Pumps, Inc. ("Buffalo"), filed its Memorandum in Opposition on February 6, 2012; [dkt. no. 57;] and Defendant Warren Pumps, LLC ("Warren") filed its Memorandum in Opposition on February 16, 2012 [dkt. no. 82].  Plaintiff filed his: reply to IMO's Memorandum in Opposition ("IMO Reply") on February 10, 2012; [dkt. no. 67;] reply to Crane's Memorandum in Opposition ("Crane Reply") on February 10, 2012; [dkt. no. 68;] reply to Buffalo's Memorandum in Opposition ("Buffalo Reply") on February 13, 2012; [dkt. no. 73;] and his reply to Warren's Memorandum in Opposition

("Warren Reply") on February 17, 2012 [dkt. no. 83].

This matter came on for hearing on February 27, 2012.
Appearing on behalf of Plaintiff were L. Richard DeRobertis,
Esq., Gary Galiher, Esq., and Ilana Waxman, Esq.  Appearing on
behalf of Buffalo were James Scadden, Esq., and Steven Hisaka,
Esq.  Appearing on behalf of IMO and Warren was Elton John Bain,
Esq.  Appearing on behalf of Crane was Lee Nakamura, Esq.[1]  After
careful consideration of the Motion, supporting and opposing
memoranda, the arguments of counsel, and the relevant legal
authority, Plaintiff's Motion is HEREBY DENIED for the reasons
set forth below.

<u>**BACKGROUND**</u>

Plaintiff filed his Complaint on September 6, 2011 in
the Circuit Court of the First Circuit, State of Hawai`i ("the
State Court").  The Complaint states that Plaintiff "worked in
and around Pearl Harbor Naval Shipyard [("Pearl Harbor")] as a
machinist" from approximately 1951 to 1964.  [Complaint at ¶¶ 1,
6.]  He also worked at Dillingham Shipyard ("Dillingham") during
approximately 1958 and 1968 to 1985, and at Kapalama Shipyard
("Kapalama") from approximately 1964 to 1967.  [<u>Id.</u> at ¶ 6.]

---

[1] Also appearing, although their clients did not respond to
the Motion and therefore could not present argument at the
hearing, were Craig Kugisaki, Esq., for Defendant Metropolitan
Life Insurance Company ("Met Life"), and Coralis Chang, Esq., for
Defendant Ingersoll Rand Co. ("Ingersoll").

The Complaint names the following defendants:

1)  Crane;
2)  Aurora Pump Company ("Aurora");
3)  Bayer Cropscience, Inc., successor in interest to Rhone-Poulenc AG Company, formerly known as Amchem Products, Inc., formerly known as Benjamin Foster Products Company ("Bayer");
4)  Union Carbide Corporation ("Union");
5)  Buffalo;
6)  Certainteed Corporation ("Certainteed");
7)  Cleaver-Brooks, Inc. ("Cleaver");
8)  Goulds Pumps, Inc. ("Goulds");
9)  IMO;
10) Ingersoll;
11) John Crane, Inc. ("John Crane");
12) The Lynch Co., Inc. ("Lynch");
13) Met Life;
14) Warren;
15) The William Powell Company ("William Powell");
16) Velan Valve Corp. ("Velan");
17) Copes-Vulcan, a subsidiary of SPX Corp. ("Copes-Vulcan"); and
18) Atwood & Morrill, a subsidiary of Weir Valves & Controls USA Inc. ("Atwood").[2]

[Id. at ¶ 2.]

The Complaint alleges that Bayer, Union, Certainteed, John Crane, and Lynch ("General Supplier Defendants")

> manufactured, sold and/or supplied certain generically similar asbestos products which were ultimately used by insulators and others, and/or to which they came in contact, while working their trades and occupations in the State of Hawai`i and other locations. . . . [They] also manufactured, sold and/or supplied certain generically similar asbestos products to Pearl Harbor Naval Shipyard and other shipyards and ships for use in the general overhaul, building, refitting and maintenance of ships.

---

[2] The Court will refer to all of the defendants collectively as "Defendants".

3

[Id. at ¶ 5.]

Further, the Complaint alleges that Crane, Aurora, Buffalo, Cleaver, Goulds, IMO, Ingersoll, Met Life, Warren, William Powell, Velan, Copes-Vulcan and Atwood ("Navy Contractor Defendants")

> sold and supplied certain equipment to the United States Navy and Pearl Harbor Naval Shipyard and other shipyards, which contained asbestos gaskets and/or packing, required asbestos insulation, or required other asbestos containing parts to function properly; and also sold replacement component parts for their equipment, including asbestos gaskets and packing which were identical to their commercial counterparts.

[Id.]

The Complaint alleges that Plaintiff "was repeatedly exposed to great quantities of asbestos, asbestos dust and asbestos fibers" during his work at Pearl Harbor, Dillingham, and Kapalama.  [Id. at ¶ 6.]  During these times, Plaintiff also inhaled asbestos dust and fibers from Defendants' products. Plaintiff claims that this exposure directly and proximately caused him to develop "asbestos pleural disease and other asbestos-related diseases and injuries to his lungs, chest cavity, cardiovascular system and other parts of his body[.]" [Id.]  Plaintiff did not discover his conditions until about October 2010.  [Id.]

4

The Complaint alleges the following claims:

1) negligence ("Count I");[3] [id. at ¶¶ 1-12;]
2) strict liability ("Count II");[4] [id. at ¶¶ 13-17;]
3) a breach of express and implied warranty claim against the General Supplier Defendants ("Count III"); [id. at ¶¶ 18-21;]
4) a claim against the General Supplier Defendants alleging liability for Plaintiff's injuries in proportion to each entity's share of the asbestos materials market ("Count IV"); [id. at ¶¶ 22-25;]
5) a claim against the General Supplier Defendants alleging liability based on a theory of industry-wide or enterprise liability ("Count V"); [id. at ¶¶ 26-30;]
6) a claim against the General Supplier Defendants alleging that they intentionally caused Plaintiff's injuries by knowingly delivering products in an unsafe and defective condition ("Count VI"); [id. at ¶¶ 31-32;]
7) a claim that Met Life conspired to conceal information about the hazards that asbestos posed to workers and bystanders in the industry ("Count VII");[5] [id. at ¶¶ 33-38;] and
8) a claim for punitive damages because Defendants, as early as 1929, possessed medical and scientific data indicating that asbestos and asbestos-containing products were hazardous to the health of Plaintiff and others in similar positions, but they ignored and

---

[3] The negligence claim against the Navy Contractor Defendants is based solely upon the "negligent failure to warn of the dangers of asbestos." [Complaint at ¶ 9.] The negligence claim against the General Supplier Defendants is based upon the negligent failure to warn, as well as negligent design, manufacture, selection of materials, assembly, inspection, testing, maintenance for sale, marketing, distribution, lease, sale, recommendation and delivery of their products in an unsafe condition, failure to discover defects, and failure to find suitable non-asbestos materials. [Complaint at ¶ 8.]

[4] As with the negligence claim, the only strict liability claim against the Navy Contractor Defendants is based upon a failure-to-warn theory. [Complaint at ¶ 16.]

[5] Count VII names "Defendants Met Life, Johns-Manville, Raybestos-Manhattan and others" as the alleged conspirators. [Complaint at ¶ 34.] Johns-Manville and Raybestos-Manhattan, however, are not named defendants in this case.

disregarded this data ("Count VIII") [id. at ¶¶ 39-42].
Plaintiff seeks: general, special, and punitive damages; costs
incurred; prejudgment interest; and any other appropriate relief.
[Id. at pg. 15.]

        Attached to the Complaint as Exhibit A is the Asbestos
Plaintiff's Summary Sheet.  It contains some of Plaintiff's
personal information, his employment history, his medical
history, and a list of the asbestos products that he came into
contact with.  It also states that he smoked cigarettes from 1942
until 2008 and that he smoked about two-and-a-half packs per
week.  Plaintiff has not filed any prior claims for asbestos
related injury.  [Id., Exh. A.]

## I.   **Removal**

        On October 21, 2011, Warren filed its Notice of
Removal.  Warren asserted that removal was appropriate under the
federal officer removal statute, 28 U.S.C. § 1442(a)(1).  Warren
argues that § 1442(a)(1) applies because Warren: 1) acted under
the direction of a federal officer in manufacturing the products
at issue; 2) has a colorable defense to Plaintiff's claims; and
3) can establish a causal nexus between Plaintiff's claims and
the acts Warren performed under the direction of a federal
officer.[6]  [Notice of Removal at ¶ 6 (some citations omitted)

_____

    [6] Warren's Notice of Removal also includes various arguments
and legal authorities in anticipation of a motion for remand.
                                              (continued...)

(citing <u>Mesa v. California</u>, 489 U.S. 121, 124-25 (1989)).]  The Notice of Removal asserts that Warren has a colorable federal defense as a government contractor pursuant to <u>Boyle v. United Technologies Corp.</u>, 487 U.S. 500 (1988). [<u>Id.</u> at ¶ 8.]

On October 24, 2011, IMO and Buffalo each filed a joinder in Warren's Notice of Removal. [Dkt. nos. 2, 6.] Crane filed its joinder on October 25, 2011.[7] [Dkt. no. 11.]

## II.  **Plaintiff's Motion to Remand**

In the instant Motion, Plaintiff emphasizes that removal under the federal officer removal statute is not automatic.  Plaintiff contends that the dispositive issues in this case are: whether the Removing Defendants have a colorable <u>Boyle</u> defense to Plaintiff's failure-to-warn claims; and whether the Removing Defendants have established a causal connection between their actions and a federal officer's direction.  [Mem. in Supp. of Motion at 7.]

Plaintiff summarizes the Complaint's allegations against the Removing Defendants as: "Defendants failed to warn about asbestos dangers (1) when selling replacement component parts (i.e., asbestos gaskets and packing); and (2) in the

---

[6](...continued)
Those arguments are more fully addressed *infra* in connection with the instant Motion.

[7] The Court will refer to Warren, IMO, Buffalo, and Crane collectively as the "Removing Defendants".

maintenance and repair of their equipment." [Id. at 9.]
Plaintiff argues that In re Hawaii Federal Asbestos Cases, 960
F.2d 806, 813 (9th Cir. 1992), precludes a Boyle defense for both
types of claims.  According to Plaintiff, in Hawaii Asbestos
Cases, the Ninth Circuit held that asbestos sellers failed to
establish "'conflict between their state law duty to provide
adequate warnings to the users of their insulation and the
conditions imposed on them pursuant to the agreements they had
entered into with the Government. . . .'" [Id. (quoting 960 F.2d
at 813).]  Under Boyle, the federal contractor defense applies
and preempts a state law claim only when: the contractor could
not comply with both its contractual obligations and the state
law duty of care; and the government officer considered the
design feature in question.  [Id. at 10-11 (citing 487 U.S. at
509, 512).]  Plaintiff argues that the "feature in question" in
the instant case is the failure to provide a warning about
asbestos to the end-users of the Removing Defendants' equipment.
The Removing Defendants have not identified any reasonably
precise specifications by the Navy which address whether
equipment manufacturers must provide asbestos warnings to end-
users of their equipment.  Plaintiff argues that it is not enough
that the Navy could have prohibited the Removing Defendants from
providing asbestos warnings or that the Navy accepted equipment
which did not have a warning.  In order to establish a colorable

Boyle defense, the Removing Defendants must establish that the Navy constrained or limited them from providing the asbestos warnings which were required pursuant to their Hawai`i law duty to warn. [Id. at 11-14.]  Plaintiff argues that there is no evidence that the Navy discussed asbestos warnings with equipment manufactures or that the Navy even considered providing asbestos warnings to equipment end-users.  The Navy's approval of the manufacturers' technical manuals, which did not contain asbestos warnings, is not enough, [id. at 14-15, 17,] nor is it sufficient for the Removing Defendants to offer hypothetical testimony that, if they had tried to include asbestos warnings, the Navy would have rejected the warnings [id. at 42-43].

Plaintiff also argues that the applicable military specifications ("MILSPECS") authorized equipment manufacturers to provide warning labels in accordance with state law, [id. at 23-25,] as confirmed by Navy documents from the relevant time period [id. at 26-28].  Plaintiff emphasizes that the United States government's official position is that the Navy's labeling standard, MIL-STD-129, did not prohibit manufacturers from providing an asbestos warning label.  [Id. at 25-26 (citing GAF Corp. v. United States, 19 Cl. Ct. 490, 490-91 (1990); GAF Corp. v. United States, 923 F.2d 947, 950 (Fed. Cir. 1991)).]  Further, the applicable MILSPECS authorized the Navy Contractor Defendants to include safety warnings about hazardous chemicals in their

technical manuals, and the MILSPECS stated that the Navy intended to accept manufacturers' commercial manuals when the products were roughly equivalent to the Navy products.  The Navy did not prohibit manufacturers from including warnings in their technical manuals about the risk of injury when removing and replacing asbestos components.  [Id. at 29-30.]  Plaintiff emphasizes that equipment manufacturers during the relevant period, including Warren and Buffalo, routinely including warnings in their technical manuals about other toxic substances.  Further, the Navy Contractor Defendants admit that they never tried to include asbestos warnings on their equipment or in their technical manuals.  [Id. at 31-37.]  When Crane and Buffalo finally included asbestos warnings on their products in the 1980s, they did so without Navy direction or objection.  [Id. at 37-39.]

Finally, Plaintiff argues that, because the Navy did not cause the Navy Contractor Defendants' failure to warn about asbestos hazards, there is no causal nexus between their federal duties and the acts and omissions which form the bases of Plaintiff's claims.  [Id. at 39-40.]  Plaintiff therefore urges the Court to grant the Motion and remand the case to the State Court.

## III. IMO's Arguments

### A.    Memorandum in Opposition

In its Memorandum in Opposition, IMO emphasizes that,

the standard applicable to the federal officer removal statute favors removal.  A removing defendant is not required to virtually win his case in order to have it removed.  IMO argues that the requirement of a colorable defense is a minimal showing, viewed in the light most favorable to the removing defendant. Further, a court evaluating federal officer removal need not engage in a complete evaluation of the merits of the defense; the defense can be considered colorable for purposes of removal even if it is eventually unsuccessful.  [IMO Mem. in Opp. at 2, 7-9.]

IMO argues that Plaintiff has not presented any expert testimony to support his position; he relies on his counsel's unsubstantiated interpretation of documents which either are irrelevant or lack foundation.  Further, Plaintiff's Motion inaccurately interprets Ninth Circuit law.  The Ninth Circuit recently recognized in Getz v. Boeing Co., 654 F.3d 852, 867 (9th Cir. 2011), that the government contractor defense is available in failure-to-warn cases and that Boyle does not limit the defense to situations where the government affirmatively precluded the warning at issue.  All that is required is that the defendant establish the government's exercise of discretion over the warnings to be provided.  [Id. at 2, 9.]  IMO argues that its government contractor defense is colorable because: the Navy promulgated reasonably precise specifications regarding the content of all written materials, including warnings; and the

11

Navy fully exercised its discretion over the written content associated with IMO's equipment.  IMO asserts that the Navy would not have accepted written materials which did not comply with the Navy's specifications.  [Id. at 2.]  IMO argues that affidavits, and their attachments, from the following persons demonstrate that the Navy exercised direct control over the design and manufacture of IMO's Navy equipment: Retired Rear Admiral Roger B. Horne, Jr. ("Horne Affidavit"); Retired Rear Admiral David P. Sargent, Jr. ("Sargent Affidavit"); and Richard M. Salzmann ("Salzmann Affidavit").[8]  These affidavits and their exhibits provide specific examples of the Navy's specifications for IMO's Navy equipment, and they describe the review and approval process which IMO engaged in with the Navy concerning the contents of manuals that IMO provided with its Navy equipment.  The affidavits also establish that the applicable

---

    [8] IMO incorporates by reference, *inter alia*, the Horne Affidavit and the Sargent Affidavit filed with Warren's December 19, 2011 Notice of Removal in Schriner v. Crane Co., et al., CV 11-00769 JMS-RLP.  [CV 11-00769, dkt. no. 1-4 (Horne Aff.), dkt. no. 1-14 (Sargent Aff.).]  IMO also incorporates the exhibits attached to those affidavits.  [IMO Mem. in Opp. at 4 n.2 (mistakenly referring to the civil number of Schriner as CV 11-00636 JMS/RLP).]  The Salzmann Affidavit is attached to IMO's Memorandum in Opposition. [Dkt. no. 54-3.]
    Each of the Removing Defendants either attached or incorporated by reference an affidavit by Admiral Sargent.  Warren's Sargent Affidavit and Buffalo's are identical.  IMO's and Crane's are signed on different dates and bear different document descriptions in the footers, but the text of all four affidavits appear to be substantively identical, with the same paragraph numbers.  The Court will therefore refer to all four collectively as the "Sargent Affidavit".

specifications did not require equipment manufacturers to provide asbestos warnings with their products.  [Id. at 4, 6.]

IMO emphasizes that the Navy required the use of asbestos thermal insulation with the equipment IMO manufactured for Navy ships.  In addition, the internal components which the Navy specified, such as sealing materials, sometimes required the use of asbestos to meet the Navy's needs.  Naval Machinery Inspectors monitored compliance with equipment specifications, and IMO equipment would not have been installed on board Navy ships unless the inspectors determined that it conformed with all applicable specifications.  [Id. at 11 (citing Horne Aff. at ¶¶ 15, 8; Sargent Aff. at ¶¶ 44, 27, 29).]

IMO argues that the Sargent Affidavit establishes that the Navy had precise specifications about any markings, communications, or directions on equipment supplied to the Navy, and manufacturers would not have been permitted, without prior approval from the Navy, to affix any warning beyond what the Navy specifically required.  He also testified that the Navy closely reviewed all instruction books and technical manuals, including "'word-by-word' line edits".  [Id. at 12 (citing Sargent Aff. at ¶¶ 57, 59).]  Admiral Sargent concludes that the Navy would not have allowed equipment manufacturers during the 1940s, 1950s, and 1960s to include an asbestos warning on equipment packaging or in documents provided with equipment for the Navy.  [Id. at 13

13

(citing Sargent Aff. at ¶ 62).]   IMO emphasizes that there is evidence in the record of the Navy's specifications dictating the materials IMO was to use in manufacturing Navy equipment, as well as examples of Navy review and approval of manuals IMO provided with Navy equipment.  [Id. at 13-14 (citing Horne Aff., Exhs. B-D; Sargent Aff., Exh. K).]   Thus, IMO argues that the Navy provided precise specifications governing the equipment IMO manufactured for the Navy, and that those specifications also addressed the subject of warnings.   The evidence clearly shows that IMO's equipment conformed to Navy specifications.  [Id. at 14-15.]   IMO also argues that the Navy had at least as much information as IMO did about potential asbestos hazards.   IMO therefore contends that it has established a colorable government contractor defense to Plaintiff's failure-to-warn claims.  [Id. at 15-17.]

        IMO next argues that there is a causal nexus between Plaintiff's claims and the actions IMO took under federal directions.   IMO contends that the causal nexus can be inferred from its demonstration of a colorable government contractor defense.   If, however, an independent showing of a causal nexus is required, IMO argues that there is sufficient evidence in the record to establish that the Navy had direct and detailed control over IMO as to warnings during the period in question.  [Id. at 17-19.]

IMO therefore urges the Court to deny the Motion.

**B.    Plaintiff's IMO Reply**

In the IMO Reply, Plaintiff argues that a colorable federal defense requires more than unsupported pleadings; it requires admissible facts supporting it, even if the facts are disputed.  Plaintiff also emphasizes that Mesa recognized that interpreting the federal officer removal statute so broadly as to include any act performed by a federal officer would be unconstitutional.  Plaintiff argues that what constitutes a colorable defense and a causal connection are constitutional questions of jurisdiction.  [IMO Reply at 3-5.]  Plaintiff argues that IMO's position relies on case law that is contrary to United States Supreme Court case law addressing causal nexus.  The cases that IMO relies upon would improperly expand the government contractor defense.  [Id. at 7-9.]  Plaintiff also notes that recent Supreme Court case law has emphasized that there is a presumption against federal preemption and has rejected federal preemption of state law failure-to-warn claims.  [Id. at 11 (citing Wyeth v. Levine, 129 S. Ct. 1187 (2009); Williamson v. Mazda Motor of Am., Inc., 131 S. Ct. 1131 (2011)).]  Plaintiff points out that the Supreme Court held in Williamson that the mere fact that the government does not require a safety feature does not mean that the government forbade manufacturers from including the feature in products sold to the government.  The

Supreme Court cautioned against treating all government safety standards as the maximum, rather than the minimum, requirements, and noted the importance of considering the government's view on whether preemption applied. [Id. at 14-15 (citing Williamson, 131 S. Ct. at 1139).] Plaintiff argues that the state law duty to warn end-users about asbestos hazards complemented, and did not oppose, the Navy's objectives and policies. Even if the Navy made a deliberate decision not to warn persons serving in the Navy, that decision would not immunize the Navy Contractor Defendants from their failure to warn the end-users of their products. [Id. at 13.]

Plaintiff also emphasizes that, where jurisdictional allegations are challenged, the party asserting federal jurisdiction has the burden of presenting facts to support jurisdiction. [Id. at 7 (citing Gaus v. Miles, 980 F.2d 564, 567 (9th Cir. 1992) (quoting McNutt v. Gen. Motors Acceptance Corp. of Indiana, 298 U.S. 178, 189 (1936)); Hertz Corp. v. Friend, 130 S. Ct. 1181, 1194-95 (2010) ("When challenged on allegations of jurisdictional facts, the parties must support their allegations by competent proof.") (diversity jurisdiction)).] Plaintiff argues that IMO's evidence that the applicable MILSPECS did not require asbestos warnings is irrelevant because the MILSPECS did not conflict with state law duties regarding warnings, and the MILSPECS allowed commercial warnings. The Removing Defendants

16

have not presented any evidence that the Navy restricted,
limited, or constrained their ability to place warnings on their
replacement part gaskets and packing.  Plaintiff argues that the
Removing Defendants only offer the testimony of professional
witnesses who speculate that the Navy would not have allowed
asbestos warnings.  Plaintiff argues that this testimony is
inadmissible and is contrary to the asbestos warnings that were
eventually given.  Plaintiff contends that the Ninth Circuit has
held that the Boyle defense does not apply to asbestos products
under such circumstances.  [Id. at 17-18 (some citations omitted)
(citing In re Hawaii Federal Asbestos Cases, 960 F.2d 806, 813
(9th Cir. 1992)).]

IV.  **Crane's Arguments**[9]

A.  **Memorandum in Opposition**

Crane emphasizes that the district judge presiding over
Multi-district Litigation ("MDL") Number 875, which addresses
common issues of federal law in asbestos cases ("MDL Court"), has
repeatedly denied motions for remand where removal jurisdiction
was based on § 1442(a)(1).  [Crane Mem. in Opp. at 4-5 (citing
Hagen v. Benjamin Foster Co., 739 F. Supp. 2d 770, 783 (MDL No.
875 2010)).]  Further, the Judicial Panel on Multi-district
Litigation ("JPML") contemplates that, even in cases which are

---

[9] To the extent the other Removing Defendants raise similar
arguments, and to the extent that Plaintiff's replies raise
similar arguments, the Court will not repeat them.

not transferred to MDL Number 875, the district courts "presiding over asbestos claims will 'almost certainly find useful guidance in the many substantive and thoughtful rulings that have been issued during the lengthy course of the multidistrict proceedings.'" [Id. at 5 (quoting Crane Mem. in Opp., Decl. of Lee T. Nakamura ("Nakamura Decl."), Exh. 2 (12/13/11 Order Adopting Suggestion to the Panel Concerning Future Tag-Along Transfers ("JMPL Order")[10]) at 3).]  Crane argues that, if other district courts follow the MDL Court's rulings, it "will promote continued uniform handling of asbestos litigation as experienced in MDL 875." [Id.]  Crane emphasizes that the JPML "specifically noted that Hagen held 'that removal pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), is proper where the defendant has identified facts which, viewed in the light most favorable to the defendant, entitle him or her to a complete defense.'" [Id. (quoting JPML Order at 3 n.5).]  Crane points out that the MDL Court in Hagen ruled that the government contractor defense was a proper basis for removal in light of facts and affidavits which were almost identical to those in the instant case, [id. at 5-6 (citing Hagen, 739 F. Supp. 2d at 783),] and the MDL Court has often denied motions to remand in other cases based on almost identical facts [id. at 7-8 (citing

---

[10] The JPML Order is available as, In re: Asbestos Products Liability Litigation (No. VI), MDL No. 875, 2011 WL 6355308 (U.S. Jud. Pan. Mult. Lit. Dec. 13, 2011).

cases)].

     In addition to the Sargent Affidavit, Crane relies on affidavits by Admiral Horne, Anthony D. Pantaleoni, Crane's Vice-President of Environment, Health and Safety ("Pantaleoni Affidavit"), and Samuel A. Forman, M.D., who Crane describes as "the proprietor of an occupational health clinic monitoring asbestos exposure and a student of the Navy's historical awareness of asbestos hazards" ("Forman Affidavit").[11]  [Id. at 8.]

     As does IMO, Crane argues that it has a colorable government contractor defense.  Crane points out that the applicable standard is set forth in Getz, in which the Ninth Circuit adopted a modified version of the Boyle analysis to address failure-to-warn claims.  [Id. at 12.]  Crane argues that its expert affidavits establish that the Navy exercised its discretion regarding warnings on Crane's products, and Crane designed and manufactured its valves according to its Navy contracts and the Navy's precise specifications, which were enforced by Navy inspectors.  The applicable MILSPECS required

---

     [11] The Sargent Affidavit, with its exhibits, is attached to Crane's Memorandum in Opposition as Exhibit 4 to the Nakamura Declaration; [dkt. nos. 55-5 to 55-16;] the Horne Affidavit, with its exhibits, is Exhibit 5 to the Nakamura Declaration; [dkt. nos. 56 to 56-3;] the Pantaleoni Affidavit is Exhibit 3 to the Nakamura Declaration; [dkt. no. 55-4;] and the Forman Affidavit, with its exhibits, is Exhibit 6 to the Nakamura Declaration [dkt. nos. 56-4 to 56-12].

asbestos sheet gaskets in the valves Crane produced for the Navy. Products which did not conform to the Navy's requirements could not be installed on Navy ships. [Id. at 13-14 (citing Pantaleoni Aff. at ¶¶ 5-6; Sargent Aff. at ¶¶ 22-32; Horne Aff. at ¶¶ 7-16).] Crane therefore argues that the Navy exercised direct and detailed control over the design and manufacture of Crane's valves. Specifically as to warnings, Crane cites the same portions of the Sargent Affidavit that IMO relied on to establish that the Navy exercised significant discretion regarding warnings and would not have permitted asbestos warnings. [Id. at 14-17 (citing Sargent Aff. at ¶¶ 57, 59-60, 62).] Crane contends that the Navy had state-of-the-art knowledge about potential asbestos hazards, and that the Navy attempted to mitigate seamen's harm from asbestos exposure as early as 1922. [Id. at 17 (citing Forman Aff. at ¶¶ 21-23, 47).] Crane further argues that its colorable government contractor defense establishes the causal nexus requirement under Mesa. [Id. at 20.]

Crane emphasizes that Plaintiff has not provided any expert evidence of his own to rebut Crane's evidence. Crane argues that Plaintiff's theories about the Navy's involvement with product warnings are unsubstantiated and do not discredit Crane's evidence. At the very least, Plaintiff's objections to Crane's evidence shows that there is a question of fact about the Navy's control over warnings. Crane argues that, in the instant

20

Motion, this Court must view the factual disputes in the light most favorable to Crane and must draw all inferences in Crane's favor. [Id. at 21 (citing Hagen, 739 F. Supp. 2d at 778).]

Crane argues that the cases which Plaintiff relies on are not persuasive and that there is ample case law supporting Crane's position that removal was proper. [Id. at 22-29 (discussing cases).] Crane therefore urges the Court to deny the Motion.

**B.    Plaintiff's Crane Reply**

Plaintiff argues that nothing in Ninth Circuit case law supports Crane's argument that all facts must be viewed in the light most favorable to Crane or that all inferences must be drawn in Crane's favor. In fact, the Ninth Circuit has held that the burden to establish jurisdiction remains on the defendant. [Crane Reply at 1 (some citations omitted) (citing Nishimoto v. Federman-Bachrach & Assocs., 903 F.2d 709, 712 n.3 (9th Cir. 1990)).]

Plaintiff also argues that Getz requires more than a mere showing of government involvement regarding warnings because in Getz, the Army wrote the manual for the defective equipment, including all of the warnings. Further, there is no causal connection in the instant case because it was the Navy Contractor Defendants that made the decision not to warn their end-users about asbestos; they were not acting under their federal

contractual duties when they did so.  Plaintiff emphasizes that Crane's only evidence that the Navy considered asbestos warnings to end-users is Crane's affidavits, which only speculate that the Navy would have prohibited such warnings.  Thus, Plaintiff argues that Crane has not shown removal was proper under the Getz analysis.  [Id. at 2-3.]

        Plaintiff argues that the case law which Crane relies upon ignores Boyle's requirement that there be reasonably precise specifications addressing asbestos warnings to end-users, which Plaintiff argues is the defect in question in this case, and that the state law duty to warn end-users must conflict with those specifications.  Plaintiff also emphasizes that Wyeth, 129 S. Ct. at 1198, 1203 n.14, requires clear evidence that the government considered and rejected warnings required by state law. Plaintiff asserts that the Navy Supplier Defendants could have provided asbestos warnings to end-users while still meeting the precise contract specifications.  [Id. at 13-14.]  Plaintiff acknowledges that the Boyle analysis must be applied in light of a duty to warn, but Plaintiff argues that all cases doing so, including Getz, still require that the government specifications conflict with the state law duty to warn.  [Id. at 15 (citing cases).]

        Plaintiff reiterates that, to establish a Boyle defense, the Removing Defendants must show that the Navy directed

22

them how to warn, or not to warn, end-users about asbestos
hazards, and thus there is no basis for a Boyle defense under the
facts in this case.  [Id. at 16 (citing Correctional Services
Corporation v. Malesko, 534 U.S. 61, 74 n.6 (2001)).]  Plaintiff
argues that there is significant case law supporting his position
that removal is improper in this type of case.  [Id. at 18
(citing cases).]

**V.   Buffalo's Arguments**

   **A.   Memorandum in Opposition**

        In its Memorandum in Opposition, Buffalo argues that
Plaintiff is improperly trying to: force the Removing Defendants
to prove the elements of their federal defense at the time of
removal; and require them to show that the Navy considered
whether equipment manufacturers should provide asbestos warnings
to end-users.[12]  Buffalo argues that the Supreme Court does not
require a defendant asserting federal officer removal to win his
case at removal.  A pre-trial trial of Buffalo's government

_____

        [12] The Court notes that, on March 16, 2012, this Court
received a letter from Buffalo's counsel, stating that Buffalo
has settled with Plaintiff.  The letter, however, states that the
stipulation for dismissal may not be filed for months because of
the logistic issues associated with the processing of the
settlement documents.  On March 20, 2012, this Court issued an EO
stating that, insofar as Buffalo is still a party to the action,
the Court was still inclined to consider Buffalo's arguments and
evidence in response to the instant Motion.  The Court gave the
parties the opportunity to file statements if they disagreed with
the Court's inclination.  [Dkt. no. 93.]  None of the parties
filed a statement.  The Court will therefore consider Buffalo's
arguments and evidence in ruling on the instant Motion.

contractor defense is not required, and one of the purposes of the federal officer removal statute is to have the validity of federal defenses tried in federal court.  All that is required is that the defense be in good faith, and the defense cannot be without foundation.  Buffalo argues that it can establish all of the elements of the government contractor defense under Getz. [Buffalo Mem. in Opp. at 2-4.]

     Although Buffalo argues that Getz does not require it to show that the Navy considered asbestos warnings, Buffalo points to its evidence that the Navy studied the dangers of asbestos in gaskets and packing and concluded there was no significant health hazard.  [Id. at 4 (citing Buffalo Mem. in Opp., Exh. 14 (W.R. Riblett, Dept. of Navy Memo re: Hazards of Asbestos, dated 9 Dec. 1968, and related materials)).]  Buffalo asserts that there is abundant evidence of the Navy's consideration, review, and determination of the warnings connected to the pumps Buffalo provided to the Navy.  Thus, Buffalo argues that it has presented sufficient allegations and supporting facts to raise a colorable government contractor defense under Getz.  [Id. at 4-5.]

     Buffalo relies on the Sargent Affidavit and its affidavits by Admiral Horne, Dr. Forman, and Martin Kraft, Buffalo's Production Manager, who began working for Buffalo in

1980.[13]  Mr. Kraft participated in the design, manufacture, and testing of the pumps Buffalo sold to the Navy.  Admiral Horne served in the Navy from 1956 to 1991, and his career was concentrated in ship design, engineering, construction, overhaul and inspection.  He served as the Chief Engineer and Deputy Commander, Naval Sea Systems Command for Ship Design and Engineering.  Admiral Sargent served in the Navy from 1967 to 1999 and has expertise in the maintenance and engineering of World War II era ships, as well as in ship engineering, maintenance, and at-sea operations.  Dr. Forman served in the Navy for six years and has also worked as a civilian Navy employee.  He has worked aboard Navy ships and in Navy shore facilities.  He assisted in an asbestos medical surveillance program involving over two thousand Navy employees and enlisted sailors.  [Id. at 6-7.]  Buffalo states that these witnesses' testimony and exhibits establish that the Navy had stringent control over production and warnings.  Buffalo notes that many other courts, including district courts within the Ninth Circuit

---

[13] The Sargent Affidavit is Exhibit 15 to Buffalo's Declaration of Counsel in Support of Opposition to Plaintiff's Motion to Remand, docket number 58 ("Buffalo Counsel Declaration").  The Sargent Affidavit and its exhibits are docket numbers 61 through 61-20.  The Horne Affidavit is Exhibit 3 to the Buffalo Counsel Declaration.  The Horne Affidavit and its exhibits are docket numbers 70-1 through 70-6.  The Forman Affidavit is Exhibit 5 to the Buffalo Counsel Declaration.  The Forman Affidavit and its exhibits are docket numbers 69-1 through 69-25.  The Kraft Affidavit, with exhibits, is Exhibit 4 to the Buffalo Counsel Declaration.  [Dkt. no. 58-2.]

and the MDL Court, have found that similar evidence was
sufficient to support removal.  In contrast, Plaintiff provides
almost no evidence except counsel's speculations based on hearsay
and MILSPECS which counsel does not have personal knowledge
about.  [Id. at 7.]

As with the other Removing Defendants, Buffalo argues
that it provided the Navy with products that were manufactured to
comply with the Navy's precise specifications, which also covered
communications affixed to Buffalo's pumps or other equipment.
The Navy had ultimate design authority, and the products that
Buffalo produced for the Navy were different than what Buffalo
sold to commercial customers.  [Id. at 8-9 (citing Kraft Aff. at
¶¶ 8, 12; Horne Aff. at ¶ 12).]  Buffalo also asserts that the
Navy exercised strict control over written materials, including
warnings, and that the Navy required specific changes to the
content and wording of manuals which Buffalo, and other
manufacturers, submitted.  Buffalo submits examples of such
changes and argues that these show that the Navy considered,
reviewed, and determined what warnings to provide, [id. at 10
(citing Exh. C),] and Buffalo argues that the government
contractor defense does not require that Navy have considered
asbestos warnings to end-users or that Buffalo prove that it
provided asbestos warnings to end-users of Buffalo's non-military
products [id. at 20-21].  Buffalo also contends that the Navy's

knowledge about asbestos hazards was superior to Buffalo's knowledge.  [Id. at 12-13.]  Buffalo therefore argues that it has established a colorable Boyle defense, as the defense is articulated in Getz.

Buffalo argues that its production of pumps to the Navy's stringent specifications and under Navy oversight assisted federal officers in the performance of their official duties. Thus, Buffalo was acting under the direction of federal officers. [Id. at 15.]  Buffalo also argues that it has established a causal connection between Buffalo's work for the Navy and Plaintiff's alleged injuries because the Navy controlled the nature of warnings to be provided with Buffalo's products.  [Id. at 26-27.]  Buffalo argues that this Court should reject Plaintiff's allegation that the Navy instructed Buffalo and other manufacturers to provide asbestos-related warnings.  Plaintiff relies primarily on MIL-STD-129C's provisions regarding hazardous chemicals in pump packaging, but that standard did not apply to Buffalo's products.  The other specifications which Plaintiff relies upon are also inapplicable, and at most they create an issue of fact that must be viewed in the light most favorable to the removing defendant.  [Id. at 29-31 (citing Sargent Aff. at ¶¶ 73-74).]

Buffalo therefore urges the Court to conclude that removal was appropriate and to deny Plaintiff's Motion.

B.   <u>**Plaintiff's Buffalo Reply**</u>

Plaintiff argues that <u>Hagen</u> is not binding on this Court and that <u>Hagen</u> is not even persuasive because it is contrary to Ninth Circuit and Supreme Court case law.  Those courts have never held that the colorable defense standard is a pleading standard in which all allegations in the notice of removal are presumed to be true.  Plaintiff also states that he has never argued that this Court must conduct a pre-trial trial to decide the instant Motion.  The Removing Defendants, however, must present competent proof to show that their asserted defense is not without foundation.  [Buffalo Reply at 1-2.]  Plaintiff argues that the Court should not follow <u>Hagen</u> because the MDL Court in that case ruled that merely acting under a federal contract creates the requisite causal nexus, and that ruling is overly broad and contrary to Supreme Court case law.  Similarly, the other cases which Buffalo relies upon as supporting the denial of remand also utilize overly broad definitions of colorable defense and causal nexus.  Plaintiff urges this Court to follow the dozens of contrary cases which have granted remand. [<u>Id.</u> at 4-8.]

Plaintiff argues that <u>Getz</u> requires the Removing Defendants to provide that the Navy constrained or limited their duty to warn and to identify a back and forth dialogue between the manufacturer and the Navy establishing the exercise of the

Navy's discretion.  [Id. at 8.]  In Getz, the Army's contract provided that it was the Army's responsibility to write the manual, and the Army's manual did attempt to warn about the defect at issue in that case.  In contrast, Buffalo drafted its own technical manuals, including discussions of safety precautions, and Buffalo included precautions about other hazardous products during the time period at issue in this case. Buffalo and the other Removing Defendants, however, did not attempt any type of asbestos warning until Buffalo and Crane began warning about asbestos in gaskets and packing in the mid-1980s.  [Id. at 9-11.]  Plaintiff also argues that Getz did not eliminate the requirements of reasonably precise specifications regarding warnings about the specific hazard at issue.  [Id. at 12-13.]

        Further, Plaintiff urges the Court to disregard the affidavits which Buffalo relies upon.  Plaintiff argues that the Court should not consider Admiral Horne's opinions because his inadmissible speculation that the Navy would not allow asbestos warnings in technical manuals is also inconsistent with the testimony that he gave during a deposition in another case. Plaintiff emphasizes that Admiral Horne did not have personal knowledge of the approval of technical manuals.  Further, the only specifications which he cites are those regarding safety precautions, and he has previously testified that he expected

those specifications to include requirements for asbestos
warnings.  [Id. at 15-17 (citing Motion, Decl. of Ilana K. Waxman
("Waxman Decl."), Exh. 39 (Admiral Horne deposition transcript
dated 6/19/02) at 31, 38-40, 42-43, 50, 52).]

       Plaintiff points out that Mr. Kraft did not begin
working for Buffalo until 1980, and therefore he has no personal
knowledge about what the Navy approved or did not approve during
the period at issue in this case.  Further, Mr. Kraft did not
present any of Buffalo's actual Navy contracts, and the technical
manual correspondence which Buffalo relies upon is actually
correspondence with Gibbs & Cox, not the Navy.  Plaintiff points
out that Mr. Kraft admitted that Buffalo began warning about
asbestos hazards in the 1980s without Navy approval.  [Id. at 18
(citing Waxman Decl., Exhs. 37 & 38 (excerpts of Martin Kraft
deposition transcripts dated 3/15/06 and 11/30/06)).]

       Plaintiff emphasizes that Dr. Forman did not join the
Navy until 1978, and he has no personal knowledge of what
warnings the Navy would have allowed, or rejected, prior to that
time.  Plaintiff also argues that Dr. Forman's speculation that
the Navy would have rejected asbestos warnings is contrary to
both the historical technical manuals, which included warnings
about other toxic products, and the fact that Buffalo and Crane
provided asbestos warnings in the 1980s.  Plaintiff argues that
federal courts have rejected this type of hypothetical

speculation.  [Id. at 19-20 (citing cases).]  Plaintiff argues
that the Removing Defendants have not, and cannot, present any
documents showing that the Navy exercised its discretion on the
issue whether manufacturers should provide asbestos-warnings to
end-users of the products they sold to the Navy.  [Id. at 20.]

## VI.  Warren's Arguments

### A.    Memorandum in Opposition

Warren relies on the Sargent Affidavit and affidavits
by Admiral Horne, Dr. Forman, and Warren's corporate
representative, Roland Doktor ("Doktor Affidavit").[14]  Warren
argues that Admiral Horne's and Admiral Sargent's affidavits are
not speculative because they are based on each witness's years of
experience following and implementing Navy policies, procedures,
and specifications.  Warren notes that the MDL Court has rejected
such objections to similar affidavits.  [Warren Mem. in Opp. at
13 (citing Willis v. BW IP Int'l Inc., 811 F. Supp. 2d 1146, 1154
(E.D. Pa. 2011)).]  Warren argues that these affidavits and their
accompanying exhibits establish the elements of a colorable

---

[14] Warren's Forman Affidavit, with exhibits, is attached to
the Declaration of Elton John Bain that Warren included with its
Memorandum in Opposition to the Motion.  [Dkt. no. 82-4.]
Warren's Memorandum in Opposition incorporates by reference its
Horne Affidavit, Sargent Affidavit, and Doktor Affidavit from
Warren's Notice of Removal.  [Warren Mem. in Opp. at 5-6.]
Warren's Horne Affidavit, and its exhibits, are docket numbers 1-
3 through 1-12; Warren's Sargent Affidavit, and its exhibits, are
docket numbers 1-13 through 1-38; and the Doktor Affidavit is
docket number 1-42.

government contractor defense, as well as a causal nexus with Plaintiff's claims because the causal nexus requirement is essentially satisfied by a showing of a colorable government contractor defense.

In addition to the general arguments that all the Removing Defendants raise to justify removal, Warren addresses Plaintiff's reliance on the fact that the Removing Defendants did not include asbestos warnings with commercial products which were comparable to the products they provided to the Navy.  Warren states that the pumps it manufactured for the Navy were distinct from the commercial products.  The Navy pumps were designed to meet standards which were different from those applicable to pumps for commercial ships or for other commercial applications. [Id. at 6 n.3 (citing Doktor Aff. at ¶¶ 7-8).]

Warren points out that the Navy intended technical manuals to address safety issues in operating procedures, not occupational health issues in general.  The Navy tried to avoid excessive warnings for general hazards aboard ships because the Navy believed excessive warnings would cause Navy personnel to be apathetic to the warnings, leaving them unaware of hazards. Thus, the Navy would not have permitted Warren to affix asbestos warnings on its pumps or to include asbestos warnings in Warren's written materials.  Instead, the Navy addressed long term health risks in training documentation for Navy-wide users.  [Id. at 8-9

(citing Sargent Aff. at ¶¶ 55, 66, 68; Horne Aff. at ¶¶ 23-24).]
Dr. Forman testified that the Navy did not use MILSPECS to
address long-term health issues like asbestos exposure.  The
Navy's Bureau of Medicine and Surgery addressed such issues
through a system that: 1) identified and evaluated long-term
threats to the well-being of Navy personnel; and 2) developed
training and mitigation procedures to address long-term threats.
[Id. at 10 (citing Forman Aff. at ¶ 62).]

        Warren argues that none of the documents Plaintiff
submitted show that the Navy required Warren to warn of the
potential hazards of asbestos, or even that the Navy gave Warren
the discretion to do so.  The Uniform Labeling Program ("ULP")
and the Consolidated Hazardous Item List ("CHIL") were for
implementation by the Navy and did not govern outside parties.
[Id. at 25-26 (citing Forman Aff. at ¶¶ 54, 56, 61).]  Further
the ULP and the CHIL focused on chemical products and the
labeling of chemical containers; it did not address minerals like
asbestos and did not address pumps and valves.  [Id. at 26
(citing Forman Aff. at ¶¶ 58, 61; Sargent Aff. at ¶ 78).]  Warren
argues that the applicable specifications "**directed** manufacturers
to warn of acute or immediate hazards unique **to the operation** of
the particular piece of equipment to which each technical manual
related, rather than to a generic occupational health hazards
that were ubiquitous throughout Navy ships." [Id. at 27 (citing

33

Forman Aff. at ¶¶ 69-73).]

Warren urges the Court to conclude that there is
federal jurisdiction pursuant to § 1442(a)(1) and to deny
Plaintiff's Motion.

**B.  Plaintiff's Warren Reply**

Plaintiff argues that the crux of the current dispute
is: "(1) the meaning of 'reasonably precise specifications', and
(2) the admissibility of Defendants' only evidence of 'conflict',
i.e., the speculation of Horne, Sargent and Forman that the Navy
hypothetically would have rejected asbestos warnings." [Warren
Reply at 1 (footnote omitted).]  Plaintiff emphasizes that
multiple district courts have found such affidavits to be
speculative and hypothetical.  [Id. at 1 n.1 (citing cases).]
Further, Willis merely held that the Navy would not have
permitted the departure from military specifications.  Plaintiff
reiterates that there were no reasonably precise specifications
limiting, constraining, or conflicting with, manufacturers' duty
to provide asbestos warnings to end-users.  [Id.]

Plaintiff argues that reasonably precise specifications
must address the government's discretionary decisions about the
design feature at issue and cannot be mere rubber stamp approval
of the manufacturer's design.  Further, government silence about
a feature does not constitute a discretionary decision.  [Id. at
2.]  Plaintiff contends that Warren has only proven that the Navy

34

chose the design; the Navy did not exercise discretion about
whether to include asbestos warnings in technical manuals or
other warnings with Warren's replacement asbestos gaskets.  [Id.
at 5.]

        Although Dr. Forman contends that the ULP did not apply
to equipment manufacturers, Plaintiff argues that the ULP is
evidence of the Navy's policy allowing warning labels in
compliance with state law.  [Id. at 6.]  Plaintiff also argues
that Dr. Forman's assertion that the Navy knew everything about
potential asbestos hazards is contradicted by his prior
deposition testimony.  [Id. at 9 (citing Crane Reply, Decl. of
Counsel, Exh. 46 (Dr. Forman deposition transcripts dated 1/7/08)
at 42).]

        Plaintiff argues that Admiral Sargent did not work in
the approval of warnings and technical manuals; his expertise is
in design specifications and military equipment, which are not at
issue in this case.  Plaintiff emphasizes that Admiral Sargent
testified during a deposition that he was not made aware of
asbestos hazards until the late 1970s.  [Id. at 9-10 (citing
Buffalo Reply, Decl. of Counsel, Exh. 49 (Admiral Sargent
deposition transcripts dated 5/25/04) at 96-97).]  Further,
although Admiral Sargent claims that the Navy required uniformity
in warnings, Plaintiff argues that the Navy issued rubber stamp
approvals of inconsistent warnings on the same products in

technical manuals, including Warren's.  [Id. at 10 (citing Waxman Decl., Exhs. 25-26).]  Plaintiff also argues that Admiral Sargent's testimony is inconsistent with several of the applicable MILSPECS.  [Id. at 11-13.]  Plaintiff emphasizes that Admiral Sargent conceded that he has never found a document showing that the Navy considered asbestos warnings.  [Id. at 13 (citing Buffalo Reply, Decl. of Counsel, Exh. 52 (excerpts of Admiral Sargent deposition transcripts dated 1/21/10) at 51-55).]

Plaintiff emphasizes that Mr. Doktor admitted that Warren sold gaskets and packing as component parts with the pumps it sold to the Navy.  Plaintiff has alleged a claim based on the failure to warn of the dangers of asbestos gaskets and packing. [Id. at 14 (citing Doktor Aff. at ¶ 7; Complaint at ¶¶ 6, 9).] Insofar as the Navy allowed the use of commercial warnings, the Navy did not limit Warren's ability to place asbestos warnings on asbestos-containing component parts for the Navy, such as gaskets and packing.  [Id. at 15 (citing In re Hawaii Federal Asbestos Cases, 960 F.2d 806 (9th Cir. 1992) (holding that the Boyle defense did not apply to the sale of asbestos products)).]

## **STANDARD**

## I.  **Federal Officer Removal**

The Removing Defendants assert that there is federal jurisdiction pursuant to the federal officer removal statute, 28 U.S.C. § 1442.  Section 1442(a)(1) states:

36

(a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

Some of the rules regarding removal and remand in general also apply to motions to remand cases removed pursuant to the federal officer removal statute, but there are some important distinctions. See, e.g., Savelesky v. Allied Packing & Supply Inc., No. C 11-01778 SI, 2011 WL 2610179, at *3 (N.D. Cal. July 1, 2011). The district court can grant a timely motion for remand based on a defect in the removal procedure. See 28 U.S.C. § 1447(c). The district court may order remand sua sponte or in response to a party's motion, and the removing party bears the burden of establishing federal jurisdiction. See Nishimoto v. Federman-Bachrach & Assocs., 903 F.2d 709, 712 n.3, 714 (9th Cir. 1990).

Unlike the general removal statutes, which "are to be strictly construed, and any doubts as to the right of removal must be resolved in favor of remanding to state court," [Durham v. Lockheed Martin Corp., 445 F.3d 1247,] 1252 [(9th Cir. 2006)] (citation omitted), "the Supreme Court has

37

mandated a generous interpretation of the federal officer removal statute," id. (citing Colorado v. Symes, 286 U.S. 510, 517, 52 S. Ct. 635, 76 L. Ed. 1253 (1932)).  There is, according to the Ninth Circuit, "a clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, **we are to interpret section 1442 broadly in favor of removal**."  Id.  Also unlike the general removal statues, under section 1442, not all defendants need concede to removal.  See El[y] Valley Mines, Inc. v. Hartford Accident & Indem. Co., 644 F.2d 1310, 1315 (9th Cir. 1981) ("Thus, § 1442 represents an exception to the general rule (under §§ 1441 and 1446) that all defendants must join in the removal petition.").  One defendant in a multi-defendant case can unilaterally remove the entire case to federal court if it meets the requirements of section 1442.  See id.

Savelesky, 2011 WL 2610179, at *3 (emphasis added).  The Supreme

Court, however, has cautioned that the broad interpretation of §

1442 is not limitless.  Watson v. Philip Morris Cos., 551 U.S.

142, 147 (2007) ("But broad language is not limitless.  And a

liberal construction nonetheless can find limits in a text's

language, context, history, and purposes.").

The Ninth Circuit has stated that a party seeking

federal officer removal must establish: "(a) it is a 'person'

within the meaning of the statute; (b) there is a causal nexus

between its actions, taken pursuant to a federal officer's

directions, and plaintiff's claims;[15] and (c) it can assert a

---

[15] The Court notes that some courts separate the second inquiry into two distinct inquiries - direction of a federal officer, and causal nexus between the defendant's acts under that direction and the plaintiff's claims.  See, e.g., Culver v.
(continued...)

'colorable federal defense.'"  <u>Durham</u>, 445 F.3d at 1251 (citing

<u>Jefferson County v. Acker</u>, 527 U.S. 423, 431, 119 S. Ct. 2069,

144 L. Ed. 2d 408 (1999); <u>Mesa v. California</u>, 489 U.S. 121,

124-25, 131-35, 109 S. Ct. 959 (1989)).

**II.  <u>Government Contractor Defense</u>**

      The federal defense which all of the Removing

Defendants have asserted is the government contractor defense.

> The Supreme Court established the framework
> of the government contractor defense in <u>Boyle v.
> United Technologies Corp.</u>, 487 U.S. 500, 108 S.
> Ct. 2510, 101 L. Ed. 2d 442 (1988).  There, the
> Court explained that procurement of military
> equipment involves "uniquely federal interests"
> that sometimes preempt a plaintiff's product
> liability claims against government contractors.
> <u>Id.</u> at 504, 108 S. Ct. 2510.  To invoke the
> defense successfully, the contractor must
> establish three elements: "(1) the United States
> approved reasonably precise specifications; (2)
> the equipment conformed to those specifications;
> and (3) the supplier warned the United States
> about the dangers in the use of the equipment that
> were known to the supplier but not to the United
> States."  <u>Id.</u> at 512, 108 S. Ct. 2510. . . .

<u>Getz</u>, 654 F.3d at 860-61.

      The court in <u>Getz</u> noted that federal courts, including

the Ninth Circuit, have held that the government contractor

defense may apply to state law failure-to-warn claims.  <u>Id.</u> at

866.  It also noted, however, that the <u>Boyle</u> analysis applies to

---

[15](...continued)
<u>Asbestos Defendants (BP)</u>, No. C 10-03484 SI, 2010 WL 5094698, at
*5 (N.D. Cal. Dec. 8, 2010) (citing <u>Mesa v. California</u>, 489 U.S.
121, 124-25, 134-35, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989)).

claims alleging design or manufacturing defects and does not

adequately address the preemption of failure-to-warn claims.    Id.

The Ninth Circuit held that, in failure-to-warn cases,

> the contractor must show that it "act[ed] in
> compliance with 'reasonably precise
> specifications' imposed on it by the United
> States" in deciding whether "to provide a
> warning."  [Butler v. Ingalls Shipbuilding, Inc.,
> 89 F.3d 582, 586 (9th Cir. 1996)] (internal
> alteration omitted).  As the Seventh Circuit has
> explained:
>
> > [W]hen state law would otherwise impose
> > liability for a failure to warn, that law can
> > be displaced when the contractor can show
> > that: (1) the government exercised its
> > discretion and approved certain warnings; (2)
> > the contractor provided the warnings required
> > by the government; [and] (3) the contractor
> > warned the government about dangers in the
> > equipment's use that were known to the
> > contractor but not to the government.
>
> Oliver [v. Oshkosh Truck Corp.], 96 F.3d [992,]
> 1003-04 [(7th Cir. 1996)].  This means that the
> contractor must demonstrate that the government
> "approved reasonably precise specifications"
> thereby limiting the contractor's "ability to
> comply with [its] duty to warn."  Snell [v. Bell
> Helicopter Textron, Inc.], 107 F.3d [744,] 749
> [(9th Cir. 1997)] (internal quotation marks
> omitted).

Id. at 866-67 (some alterations in Getz).

## DISCUSSION

## I.   Evidentiary Objections

On November 14, 2011, Plaintiff filed his Evidentiary

Objections to the Affidavits of David P. Sargent, Jr., Roger B.

Horne, Jr., and Samuel A. Forman ("Objections").  [Dkt. no. 30.]

Plaintiff objects to the defense's proffered "expert" affidavits on the following grounds:

1. Lack of foundation.  None of the witnesses were involved in enforcing MIL-STD-129, MIL-M-15071, or in determining appropriate warnings to be given by Navy equipment vendors.

2. Speculation and Conjecture.  These witnesses are offering improper testimony about what the Navy might have done if a manufacturer had tried to warn about asbestos – something that the manufacturers never did.  This is not evidence.

3. Best Evidence Rule.  Defense witnesses rely on contract documents which are not provided. (No contracts between Defendants and the Navy are given.)  They also give verbal testimony about the meaning of Navy specifications, rather than the specifications themselves.

[Objections at 3.]  Buffalo filed a response to the Objections on February 6, 2012.  [Dkt. no. 62.]

Having reviewed the affidavits and accompanying exhibits, the Court finds that Admiral Horne, Admiral Sargent, and Dr. Forman have personal knowledge of some the events and applicable specifications relevant to the instant Motion.  In particular, even though Admiral Horne and Admiral Sargent may not have had first-hand experience applying some of the relevant specifications, they have knowledge, in the course of their official duties, of the specifications which existed during the relevant period and their knowledge is helpful to the determination of the issues at hand.  As to the best evidence

41

rule objection, it is misplaced.  These witnesses are not proving the content of the contract documents but are testifying based upon their experience as to what the Navy required manufacturers to do.  See Willis v. BW IP Intern, Inc., 811 F. Supp 2d 1146, 1155 (E.D. Pg 2011).  The Removing Defendants have sufficiently shown that, at this preliminary stage of the case, this Court can consider these affidavits, to the extent that the affidavits provide percipient testimony.  The Court expresses no opinion as to whether the affidavits will be deemed admissible under a full evidentiary analysis applicable to a motion for summary judgment or at trial, nor does the Court express any opinion as to whether these affidavits, and/or other testimony from Admirals Horne and Sargent and Dr. Forman, can be considered expert testimony.  The Court therefore overrules Plaintiff's Objections.

     The Court now turns to the issue whether the Removing Defendants have established that the instant case meets the requirements for federal officer removal, as described by the Ninth Circuit in Durham.

**II.  A Person under § 1442**

     The first requirement for federal officer removal is that the removing party must be a "person" within the meaning of § 1442.  Durham, 445 F.3d at 1251.  Plaintiff does not dispute that each of the Removing Defendants is a "person" for purposes of § 1442.  Accord Culver, 2010 WL 5094698, at *5 ("A 'purely

legal person such as a corporation could be engaged in activities
that amount to the implementation of a federal policy under the
direction of a government officer such that state court suits
against those corporations could disrupt the execution of federal
law.'" (quoting Fung v. Abex Corp., 816 F. Supp. 569, 572 (N.D.
Cal. 1992))).   The debate in the instant case centers around
whether the Removing Defendants have asserted a colorable defense
and whether they have established a causal connection between
Plaintiff's claims and the actions they took under the direction
of a federal officer.   The Court considers each in turn.

## III. Colorable Defense

    Neither § 1442 itself, the United States Supreme Court,
nor the Ninth Circuit has expressly defined what a "colorable"
defense means for purposes of federal officer removal.   Thus, at
the outset, the Court will review the relevant case law to
determine the standard which this Court must use to determine
whether the Removing Defendants' government contractor defense is
colorable.

### A.    Case Law Regarding the Meaning of "Colorable"

    The Supreme Court has stated that:

    In construing the colorable federal defense
    requirement, we have rejected a "narrow, grudging
    interpretation" of the statute, recognizing that
    **"one of the most important reasons for removal is
    to have the validity of the defense of official
    immunity tried in a federal court."** [Willingham
    v. Morgan,] 395 U.S. [402,] 407, 89 S. Ct. 1813

43

> [(1969)].  We therefore **do not require the officer
> virtually to "win his case before he can have it
> removed."**  Ibid.

Jefferson Cnty., Ala. v. Acker, 527 U.S. 423, 431 (1999)

(emphases added).  The Supreme Court has also noted, in the

context of § 1442(a)(1) removal of a criminal prosecution, that

> No question of guilt or innocence arises and **no
> determination of fact is required** but it must
> fairly appear from the showing made that
> petitioner's claim is **not without foundation and
> is made in good faith**.
>
>      As said by Chief Justice Taft speaking for
> the court in Maryland v. Soper, . . . 270 U.S.
> [9,] 33, 46 S. Ct. 185, 190, 70 L. Ed. 449
> [(1926)]: "It must appear that the prosecution
> * * * has arisen out of the acts done by him under
> color of federal authority and in enforcement of
> federal law, and he must by direct averment
> exclude the possibility that it was based on acts
> or conduct of his, not justified by his federal
> duty. * * * [p. 34 of 270 U. S., 46 S. Ct. 185,
> 191, 70 L. Ed. 449.] . . . .  He must establish
> fully and fairly this defense by the allegations
> of his petition for removal before the federal
> court can properly grant it.  It is incumbent on
> him, conformably to the rules of good pleading, to
> make the case on which he relies, so that the
> court may be fully advised and the state may take
> issue on a motion to remand."

Colorado v. Symes, 286 U.S. 510, 519 (1932) (emphases added)

(some alterations in original); see also, e.g., Culver, 2010 WL

5094698, at *6 (recognizing that "[p]ursuant to the Durham policy

favoring removal for federal officers, a defendant does not need

to show a valid or likely successful federal defense, but merely

a colorable one" (citing Durham, 445 F.3d at 1252)); Olschewske

v. Asbestos Defendants (B-P), No. C 10-1729 PJH, 2010 WL 3184317, at *2 (N.D. Cal. Aug. 11, 2010) (noting that a "colorable" defense "is not the same thing as establishing that a defense applies to bar asserted claims").

Plaintiff, however, urges the Court to conduct a more exacting review. For example, in Holdren v. Buffalo Pumps, Inc., cited by Plaintiff, the district court stated:

> By Mesa's terms, the asserted federal defense must only be "colorable" to justify removal. 489 U.S. at 132-34, 109 S. Ct. 959. Yet removal of a federal officer's case has never been automatic. As a constitutional matter, a defendant must aver something more than his status as a federal officer in order to bring his case into a federal forum. It is only the assertion of a colorable federal defense that justifies the federal court's limited Article III jurisdiction in these cases. See Mesa, 489 U.S. at 136-38, 109 S. Ct. 959 (denying removal of state criminal cases against postal service employees because the charged officers had not asserted a colorable federal defense). Without this requirement, § 1442(a) would "expand[] the jurisdiction of the federal courts beyond the bounds established by the Constitution." Id. at 136, 109 S. Ct. 959 (quoting Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 491, 103 S. Ct. 1962, 76 L. Ed. 2d 81 (1983)). Because it alone confers Article III jurisdiction, the "colorable" standard requires that a federal court carefully weigh the plausibility of the proffered defense. See Adams v. Reliance Standard Life Ins. Co., 225 F.3d 1179, 1182 (10th Cir. 2000) ("In light of the limited subject matter jurisdiction granted to the federal courts by Congress, we have a duty to satisfy ourselves that jurisdiction is appropriate.").

614 F. Supp. 2d 129, 140 (D. Mass. 2009) (footnote omitted).

The district court in Holdren also noted that "private

government contractors — particularly those in failure-to-warn cases — are several degrees distant from" the types of government officials who historically received the benefit of the federal officer statute, such as customs officials, tariff collectors, prohibition agents, judges, and immigration officers.  Id. at 136 (citing Watson v. Philip Morris Cos., Inc., 551 U.S. 142, 127 S. Ct. 2301, 2304-07, 168 L. Ed. 2d 42 (2007); Colorado v. Symes, 286 U.S. 510, 52 S. Ct. 635, 76 L. Ed. 1253 (1932); Jefferson County, Ala. v. Acker, 527 U.S. 423, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999); Arizona v. Manypenny, 451 U.S. 232, 101 S. Ct. 1657, 68 L. Ed. 2d 58 (1981)).  Thus, Holdren asserts that military contractors asserting the government contractor defense as the basis for removal "'bear a special burden'" under § 1442(a)(1), id. (quoting Ryan v. Dow Chemical Co., 781 F. Supp. 934, 939 (E.D.N.Y. 1992)), and that some of those special burdens are set forth in the Boyle analysis.

        This Court, however, disagrees with Holdren's characterization of the government contractor defense as placing limitations on the general standards applicable to federal officer removal.  The primary purpose of the federal officer removal statute is

                to protect the Federal Government from the
                interference with its "operations" that would
                ensue were a State able, for example, to
                "arres[t]" and bring "to trial in a State cour[t]
                for an alleged offense against the law of the
                State," "officers and agents" of the Federal

Government "acting . . . within the scope of their authority."

Watson, 551 U.S. at 150 (quoting Willingham, 395 U.S. at 406, 89 S. Ct. 1813) (alterations in Watson).  Private government contractors may be several degrees removed from the federal officials who historically benefitted from federal officer removal jurisdiction, but the United States Supreme Court recognized in Boyle that cases involving private contractors implicate the same uniquely federal interests as cases involving federal employees - "getting the Government's work done."  487 U.S. at 505 & n.1.  Further, "[t]he imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price.  Either way, the interests of the United States will be directly affected."  Id. at 507; see also Durham, 445 F.3d at 1253 ("If the federal government can't guarantee its agents access to a federal forum if they are sued or prosecuted, it may have difficulty finding anyone willing to act on its behalf.").  The Supreme Court also recognized that, because the government contractor defense raises such uniquely federal concerns, the conflict between federal policy and state law "need not be as sharp" as the conflict that would ordinarily be required to support federal preemption of state law.  Boyle, 487 U.S. at 507 (citing Rice v. Santa Fe Elevator Corp., 331 U.S.

47

218, 230, 67 S. Ct. 1146, 1152 (1947)).  Thus, nothing in <u>Boyle</u> indicates that a private government contractor's invocation of the federal officer removal statute is subject to greater scrutiny than a federal employee's.

The Court also is unpersuaded by the Article III concerns articulated in <u>Holdren</u>.  The Court agrees with the analysis of this issue set forth by the MDL Court in <u>Hagen</u>:

> Although the Supreme Court has expressed concerns about the constitutionality of Section 1442(a)(1) if a colorable defense was not required for removal, see <u>Mesa</u>, 489 U.S. at 137, 109 S. Ct. 959, it did not — as cases like <u>Holdren</u> suggest — expressly hold the lack of a colorable defense requirement would "expand[] the jurisdiction of the federal courts beyond the bounds established by the Constitution."  <u>Holdren</u>, 614 F. Supp. 2d at 140 (internal marks omitted) (quoting <u>Mesa</u>, 489 U.S. at 136, 109 S. Ct. 959).  Rather, it adopted a narrower interpretation of Section 1442(a)(1) to avoid resolution of this very question.  See <u>Mesa</u>, 489 U.S. at 137, 109 S. Ct. 959.  Thus, the Article III concerns that allegedly require the court to "carefully weigh the plausibility of the proffered defense," <u>Holdren</u>, 614 F. Supp. 2d at 140, are overstated; the colorable defense requirement is a simple statutory limit on subject matter jurisdiction that may or may not be coextensive with what Article III permits.  The Court, therefore, can balance the interest in broadly construing removal under Section 1442(a)(1) against its statutory limits and any associated constitutional concerns without requiring defendants to make such a significant showing of the merits of their defense at this early stage. . . .

739 F. Supp. 2d at 781-82 (alteration in <u>Hagen</u>) (footnote

omitted).[16]  <u>Hagen</u> is well reasoned, and this Court finds it to

be particularly persuasive because it comes from the MDL Court,

which has dealt with thousands of similar cases from across the

country.  <u>See</u> JMPL Order, 2011 WL 6355308, at *2 & n.5 (listing

<u>Hagen</u> as one of the "substantive and thoughtful rulings that have

been issued during the lengthy course of" MDL Number 875, which

will provide "useful guidance" to district courts presiding over

asbestos actions that will not be transferred to MDL Number 875);

<u>see also</u> <u>McClelland v. Merck & Co.</u>, CIV. No. 06-00543 JMS/BMK,

---

[16] The Court disagrees with the observation in <u>Hagen</u> that, after denying a plaintiff's motion for remand, if the court determines later in the proceeding that "the relevant facts developed in the litigation do not support jurisdiction," the court must dismiss the case for lack of subject matter jurisdiction and remand it to the state court.  739 F. Supp. 2d at 782.  As a general rule, the existence of removal jurisdiction is determined at the time the removal petition is filed, irrespective of subsequent events.  <u>See, e.g.</u>, <u>Abada v. Charles Schwab & Co., Inc.</u>, 300 F.3d 1112, 1117 (9th Cir. 2002).  Federal courts have applied this general rule to federal officer removal jurisdiction.  <u>See, e.g.</u>, <u>Jamison v. Wiley</u>, 14 F.3d 222, 239 (4th Cir. 1994) ("Nothing in the federal removal statutes authorizes the remand of a case that has been properly removed under § 1442(a)(1) on the ground that the federal employee's immunity defense is later rejected." (citing 28 U.S.C. § 1447(c)).
The MDL Court also noted that the dismissal and remand after subsequent rejection of the defense "is particularly appropriate in view of the limited opportunity for appellate review of remand orders."  <u>Hagen</u>, 739 F. Supp. 2d at 782 n.12 (some citations omitted) (citing 28 U.S.C. § 1447(d) ("An order remanding a case to the State court . . . is not reviewable on appeal or otherwise . . . .")).  In 2011, however, Congress amended § 1447(d) to allow review of orders remanding cases removed pursuant to § 1442.  Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545.
These issues, however, do not diminish the persuasiveness of the other aspects of the <u>Hagen</u> analysis.

2007 WL 178293, at *2 (D. Hawai`i Jan. 19, 2007) (noting that, when faced with both a motion to remand and a motion to stay pending transfer to a multi-district litigation court, the court should consider whether "deference to a MDL court will further the uniformity, consistency, and predictability in litigation that underlies the MDL system" (citations and quotation marks omitted)).

The Court therefore rejects the <u>Holdren</u> standard, which would require this Court to carefully weigh the plausibility of the Removing Defendants' government contractor defense. <u>Holdren</u> applies a more exacting standard than the colorable defense requirement described in Supreme Court case law. The elements of the government contractor defense do not limit the broad interpretation of § 1442(a)(1). Instead, when a court evaluates whether a removing defendant's government contractor defense is colorable, the court must make that determination with the principles of federal officer removal jurisdiction in mind: § 1442(a)(1) is interpreted broadly in favor of removal; the removing defendant need not virtually win his case to justify removal; the removing defendant need only establish that the defense is "not without foundation" and was made in good faith; and a federal court should generally decide whether the government contractor defense immunizes a defendant from liability for a plaintiff's state law claim. Thus, this Court

agrees with the MDL Court that, even where the asserted federal

defense is the government contractor defense, "a defense is

colorable for purposes of determining jurisdiction under Section

1442(a)(1) if the defendant asserting it identifies facts[17]

which, viewed in the light most favorable to the defendant, would

establish a complete defense at trial." See Hagen, 739 F. Supp.

2d at 783 (footnote omitted).

    The Court now turns to the issue whether any one of the

Removing Defendants has alleged a colorable government contractor

defense in this case.[18]

---

[17] The Court notes that the identification of facts is not
limited to the allegations in the notice of removal.  A removing
defendant must, of course, plead sufficient allegations in the
notice of removal to put the plaintiff on notice of what the
federal defense is and to allow the plaintiff to respond with a
motion for remand.  Colorado v. Symes, 286 U.S. at 519 ("It is
incumbent on [the removing defendant], conformably to the rules
of good pleading, to make the case on which he relies, so that
the court may be fully advised and the state may take issue on a
motion to remand.").  A court, however, cannot determine if the
asserted federal defense is "not without foundation" and "made in
good faith", id., merely by examining the allegations in the
notice of removal.  To the extent that the Removing Defendants
assert that the colorable defense standard is a pleading-only
standard, the Court rejects this position.

[18] As previously noted, § 1442 removal does not require the
consent of all defendants; a single defendant in a case with
multiple defendants can remove the entire action if the defendant
meets the requirements of § 1442.  Ely Valley Mines, Inc. v.
Hartford Accident & Indem. Co., 644 F.2d 1310, 1315 (9th Cir.
1981).  Thus, one defendant's proper removal is effective as to
all of the defendants, even if another defendant's attempt to
remove was defective in some manner.  See, e.g., Plourde v.
Ferguson, 519 F. Supp. 14, 16 (D. Md. 1980) ("Where a single
defendant timely removes a case under § 1442, the entire case is
                                          (continued...)

**B.**    <u>Whether There Is a Colorable Defense in This Case</u>

Plaintiff's state law claims against the Navy Contractor Defendants are based on a failure-to-warn theory, and the Removing Defendants assert that their government contractor defense is a complete defense to Plaintiff's claims.  As previously noted, although <u>Boyle</u> established the framework of the defense, <u>Boyle</u> was a design/manufacturing defect case and therefore the <u>Boyle</u> analysis is not tailored for failure-to-warn claims.  <u>Getz</u>, 654 F.3d at 866 ("a contractor cannot defeat a failure-to-warn claim simply by establishing the elements of the <u>Boyle</u> defense as it applies to design and manufacturing defect claims" (citation omitted)).  This Court will therefore apply the modified <u>Boyle</u> analysis that the Ninth Circuit set forth in <u>Getz</u>.

Plaintiff argues that <u>Getz</u> did not eliminate the <u>Boyle</u> requirements that: 1) the government approved "reasonably precise specifications" regarding the defect in question; and 2) the contractors' obligations under those federal specifications must actually conflict with their state law duties.  Plaintiff argues that the defect in question in this case is the failure to provide asbestos warnings to the end-users of the Removing

---

[18](...continued)
thereby removed, regardless of whether the other defendants, federal officials or not, properly join in the removal petition, or have themselves already filed untimely petitions." (emphasis in original) (citing <u>Howes v. Childers</u>, 426 F. Supp. 358 (E.D. Ky. 1977)).

Defendants' products.  Plaintiff contends <u>Getz</u> did not overrule
prior Ninth Circuit case law, under which Plaintiff argues the
Removing Defendants are required to prove that the Navy
effectively prohibited them from providing asbestos warnings to
end-users during the period that he worked at Pearl Harbor.

First, this Court agrees with Plaintiff that the
modified <u>Boyle</u> analysis in <u>Getz</u> requires both reasonably precise
specifications issued by the federal government, as well as a
conflict between the contractor's work under those specifications
and the contractor's duty to warn under state law.  This Court,
however, disagrees with Plaintiff's position that <u>Getz</u> requires a
defendant asserting the government contractor defense to prove
that the government effectively prohibited the specific warning
at issue.  While such a prohibition would certainly meet the
requirements of the government contractor defense, it is not a
minimum requirement that all defendants asserting the defense
must prove.  <u>Getz</u> merely states that "the contractor must show
that it act[ed] in compliance with 'reasonably precise
specifications' imposed on it by the United States in deciding
whether to provide a warning" and that "the government exercised
its discretion and approved **certain warnings**[.]"  654 F.3d at 866
(emphasis added) (citations and internal quotation marks
omitted).  In fact, the Ninth Circuit in <u>Getz</u> rejected the
proposition that earlier Ninth Circuit decisions require a

defendant asserting the government contractor defense to prove
that the government rejected the specific warning at issue in the
case.

> We are not persuaded by Plaintiffs'
> suggestion that our decisions in Butler [v.
> Ingalls Shipbuilding, Inc., 89 F.3d 582 (9th Cir.
> 1996),] and [In re] Hawaii Federal Asbestos[, 960
> F.2d 806 (9th Cir. 1992),] limit the defense to
> cases in which the government specifically forbids
> warnings altogether or to instances where the
> government explicitly dictates the content of the
> warnings adopted.  These cases only require that
> governmental approval (or disapproval) of
> particular warnings "conflict" with the
> contractor's "duty to warn under state law."
> Butler, 89 F.3d at 586; see also Haw. Fed.
> Asbestos, 960 F.2d at 813 (rejecting the defense
> where the government's specifications were silent
> about warnings).  To read these cases as limiting
> preemption to those instances where the government
> forbids additional warning or dictates the precise
> contents of a warning would be inconsistent with
> the Court's decision in Boyle.  See Oliver [v.
> Oshkosh Truck Corp.], 96 F.3d [992,] 1004 n.8
> [(7th Cir. 1996)] (rejecting plaintiff's argument
> that Butler and Hawaii Federal Asbestos could be
> interpreted as imposing such a "rigid" rule).
> Boyle makes clear that government discretion,
> rather than dictation, is the standard.  487 U.S.
> at 512-13, 108 S. Ct. 2510. . . .

Id. at 867.  The Court now turns to the application of the Getz
analysis in the instant case.

### 1.   The Government's Exercise of Discretion

The Removing Defendants devoted significant attention
to the MILSPECS and other requirements for the design and
production of items for the Navy.  Plaintiff likely would not
dispute that the Navy issued reasonably precise specifications

regarding design and production in general.  Nor does there appear to be any dispute that the Removing Defendants were required to use asbestos in certain products for the Navy.  At issue in the instant Motion, however, is the failure to warn the products' end-users of the potential asbestos hazards.

As previously noted, the Getz analysis still requires that the defendant asserting the government contractor defense demonstrate that the government approved reasonably precise specifications which limited the contractor's ability to satisfy its state law duty to warn.  The government must have exercised its discretion by approving reasonably precise specifications allowing certain warnings.  Getz, 654 F.3d at 866-67.  In analyzing the plaintiff's design defect claim, the Ninth Circuit stated:

> As we explained in Snell v. Bell Helicopter Textron, Inc., the government's approval of a particular specification must be more than a cursory "rubber stamp" approving the design.  107 F.3d 744, 748 (9th Cir. 1997).  Rather, approval must result from a "continuous exchange" and "back and forth dialogue" between the contractor and the government.  Butler v. Ingalls Shipbuilding, Inc., 89 F.3d 582, 585 (9th Cir. 1996).  When the government engages in a thorough review of the allegedly defective design and takes an active role in testing and implementing that design, Boyle's first element is met.  Id.

654 F.3d at 861.  Considering this explanation of reasonably precise specifications together with the first requirement of Getz's modified Boyle analysis, this Court must determine whether

the Removing Defendants have made a colorable showing that they complied with reasonably precise specifications in excluding asbestos warnings from their Navy products and whether a continuous exchange between the Navy and the Removing Defendants which shows that the Navy exercised its discretion and approved certain warnings.

The Removing Defendants submitted evidence that the Navy had detailed and extensive requirements and specifications governing products manufactured for the Navy, and that Navy strictly enforced these requirements and specifications. [Doktor Aff. (dkt. no. 1-42) at ¶¶ 7-8; Kraft Aff. (dkt. no. 58-2) at ¶¶ 4-6.] Among the requirements and specifications was the requirement that manufacturers submit all of their technical manuals, as well as other written materials provided with their products, to the Navy for comment, approval, and acceptance. [Doktor Aff. at ¶¶ 8-9; Kraft Aff. at ¶¶ 13-14.] The Navy had reasonably precise specifications about notes, cautions, and warnings in technical manuals. [Sargent Aff., Exh. S (dkt. no. 61-20), MIL-M-15071D (SHIPS) dated 6/1/61, at § 3.3.6.] Although the parties dispute whether MIL-STD-129 applied to the Removing Defendants' products, MIL-STD-129 is an example of the Navy's reasonably precise specifications about markings on products, including cautionary labels. [Sargent Aff. (dkt. no. 61) at ¶¶ 72-74 (discussing MIL-STD-129); Waxman Decl., Exh. 8 (dkt. no.

28-10), excerpts of MIL-STD-129B dated 4/10/57, Exh. 9 (dkt. no.

28-11), excerpts of MIL-STD-129C dated 7/11/60.]

As to whether the Navy engaged in a continuous exchange

and/or back and forth dialogue regarding the warnings that the

Removing Defendants included with its products for the Navy, the

Sargent Affidavit states:

> Navy personnel or those of the Navy's Design Agents participated intimately in the preparation and review of these instruction books and technical manuals in a standardized format used by the Navy.  These manuals included safety information to the extent - and only to the extent - directed by the Navy.  Manufacturers of components and equipment were not permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to include any type of warning or caution statement in instruction books or technical manuals, beyond those required and approved by the Navy without prior discussion and approval by the Navy.  **The Navy dictated and, itself or through its Design Agents, reviewed and approved the contents of all technical manuals, including any cautionary language or emphasis.**  The Navy approached this process for review and approval of technical manuals in an exacting manner.  **It often created lengthy memoranda detailing word-by-word line edits to the content of technical manuals submitted for approval, including the wording of instructional material and warnings.**  Examples of such correspondence are attached as Exhibit K.  Review of and comment upon instructional materials by the Navy's Design Agents was similarly detailed.

[Sargent Aff. (dkt. no. 61) at ¶ 59 (emphases added).]

Admiral Sargent's Exhibit K includes numerous memoranda

describing the Navy's edits to technical manuals.  [Sargent Aff.,

Exh. K (dkt. no. 61-12).[19]]  Each memorandum is addressed to one
of several manufacturers, including Buffalo and Warren.  The
edits address a myriad of topics in the technical manuals,
including warnings and cautionary instructions.  For example,

> Since toxic fluids should not be used as solvents
> aboard ship, it is recommended that the manual be
> revised to incorporate the use of cleaning agent,
> heavy duty de-greasing compound conforming to
> Military Specification, MIL-C-20207, in lieu of
> gasoline and carbon tetrachloride.  This compound
> is relatively non-toxic, however, it is alkaline
> and contact with the skin should be avoided.  The
> revision of the manual should include a
> precautionary note such as use of goggles and
> rubber gloves while utilizing this cleaning agent.

[Id. at 50[20] (Mem. dated 4/7/60 to Supervisor of Shipbuilding,
U.S. Navy, New York, from Chief, Bureau of Ships, regarding
Worthington Corporation's preliminary technical manual for
turbine driven main feed pumps).]

The Navy directed DeLaval Steam Turbine Company to
include a "CAUTION" paragraph stating, *inter alia*, "[s]ealing

---

[19] Although all of the Removing Defendants' Sargent
Affidavits are substantively identical, there appear to be
multiple versions of Exhibit K to the Sargent Affidavit.  Exhibit
K to Buffalo's Sargent Affidavit appears to be identical to
Exhibit K to Crane's Sargent Affidavit, and Exhibit K to IMO's
Sargent Affidavit appears to be identical to Exhibit K to
Warren's Sargent Affidavit.  Buffalo's and Crane's Exhibit K,
however, appears to contain more pages than IMO's and Warren's
Exhibit K.  Thus, all of this Court's citations to Exhibit K to
the Sargent Affidavit refer to Buffalo's Exhibit K (dkt. no. 61-
12).

[20] The pages of Exhibit K are not consecutively paginated.
The Court's citations therefore refer to the page numbers of the
document in the district court's cm/ecf system.

steam should not be admitted to glands of a stationary turbine",
after a specific paragraph in DeLaval's turbine generator
instruction book.  [Id. at 52-53 (Mem. dated 9/14/60 to DeLaval
Steam Turbine Co., from Chief, Bureau of Ships).]  The Navy also
directed Foster Wheeler Corporation ("Foster") to substitute
instructions from the Navy for Foster's instructions regarding
tube failure in its preliminary technical manual for its boilers.
[Id. at 59, 61 (Mem. dated 1/9/61 to Foster, from Chief, Bureau
of Ships).]

In particular, Buffalo notes that the Navy also gave it
this type of specific edits regarding warnings and cautions, as
evidenced by at July 28, 1996 memorandum to Buffalo from the
Navy's Design Agent, Todd Shipyards Corporation (Seattle
Division), by Gibbs & Cox, Inc.[21]  [Id. at 71-74 (memorandum
regarding the review of the equipment manual for Buffalo's
distiller feed pumps).]  The memorandum stated, inter alia:

> (f)   Page 1-3-1, Paragraph 1-3-1
>       (1)   Under "Warning" add the following "Never
>             use water on electrical fires.  Use

---

[21] The Kraft Affidavit states that "the Navy required
specific changes to the content and wording of manuals submitted
by Buffalo Pumps and other naval equipment manufactures.  These
changes included specific edits to cautionary and instructional
language, and including warnings and cautions.  Examples of
correspondence of this type are attached as Exhibit C."  [Kraft.
Aff. (dkt. no. 58-2) at ¶ 14.]  The July 28, 1966 memorandum is
one of the documents included in Mr. Kraft's Exhibit C.  [Dkt.
no. 58-2, pgs. 56-59.]  IMO also highlights this edit in its
version of Exhibit K to the Sargent Affidavit.  [IMO's Sargent
Aff., Exh. K-3 (CV 11-00769, dkt. no. 1-29) at 7.]

> $CO_2$."  Also add "When servicing pump,
> disconnect from sources of electrical
> power and tag."

[Id. at 72.]  The memorandum concludes with: "It is requested

that the pump manufacturer's acceptance of the above comments be

forwarded to the Design Agent by August 15, 1966.  Resubmittal is

not required."  [Id. at 74.]

Admittedly, none of the example memoranda attached to

the Sargent Affidavit have Navy edits specifically addressing

asbestos warnings, and many of the examples of edits to warnings

or cautionary language are addressed to other manufacturers, not

the Removing Defendants.  The one memorandum to Buffalo with an

edit to warning language is outside of the period during which

Plaintiff worked at Pearl Harbor.  As previously emphasized,

however, the applicable standards when a court considers a motion

to remand a case removed under § 1442(a)(1) favor removal and the

colorable defense standard is not an exacting standard.  This

Court is not required to make findings of fact on the ultimate

success of the Removing Defendants' government contractor

defense.  That being said, the Removing Defendants have

identified evidence showing that the Navy issued reasonably

precise specifications about warnings applicable to the Removing

Defendants' products and these specifications did not provide for

an asbestos warning to end-users.  To the extent that they have

presented evidence that the Navy's specifications limited the

60

warnings that manufacturers could provide with Navy products, the Removing Defendants have made a colorable showing that the Navy's specifications conflicted with manufacturer's state law duties. Pursuant to those specifications, the Removing Defendants did not include a warning to end-users about the potential hazards of asbestos.[22]  The Removing Defendants presented evidence that the Navy regularly engaged in a continuous exchange with its manufacturers in general regarding all manner of subjects, including warnings and cautionary instructions, in written materials for the manufacturers' products.  Specifically, Buffalo has presented an example of the back and forth dialogue between it and the Navy (through the Navy's Design Agent) about warnings in Buffalo's technical manuals.

---

[22]  For example,

> Under the direction and control of officers and agents of the U.S. Navy, pumps supplied by Warren Pumps were built in accordance with the U.S. Navy specifications, tested pursuant to those specifications and then approved by the U.S. Navy. The U.S. Navy specifications for pumps incorporated several lower-level specifications, including those governing the components or materials used for or with the pumps, such items as metals, bearings, packing, gaskets, etc.
>     8.  . . . Navy pumps also incorporated numerous other characteristics and met different standards than pumps supplied for commercial applications, and manuals, drawings and other written materials accompanying pumps were subject to Navy review to ensure compliance with Navy requirements . . . .

[Doktor Aff. (dkt. no. 1-42) at ¶¶ 7-8.]

This Court therefore FINDS that Buffalo has made a colorable showing that it can establish the first element of the Getz analysis.  Insofar as one defendant's proper removal under § 1442(a)(1) is sufficient for this Court to exercise jurisdiction over all Defendants in this case, see supra note 17, this Court need not address whether any of the other Removing Defendants have established that it can assert a colorable defense.  The Court emphasizes that it makes no findings regarding whether or not Crane, IMO, and Warren established that they can assert colorable government contractor defenses.

## 2.   Provision of the Government's Required Warnings

The second element of the Getz analysis is that the contractor provided the government's required warnings.  654 F.3d at 866.  Buffalo submitted testimony that "[a]ll pumps supplied by Buffalo Pumps to the Navy were built in accordance with the Navy specifications or other technical documentation identified in applicable contract documents."  [Kraft Aff. (dkt. no. 58-2) at ¶ 8.]  As previously noted, the Navy's specifications included requirements for written materials, including technical manuals and labels or markings, submitted with products manufactured for the Navy.  The Navy carefully scrutinized these materials, and products that did not conform to the Navy's specifications were rejected.  Thus, the Navy actual acceptance and utilization of Buffalo's products indicates that Buffalo's products, including

the written materials associated therewith, conformed to the
Navy's specifications and requirements.  The Court therefore
FINDS that Buffalo has made a colorable showing that it can
establish the second element of the <u>Getz</u> analysis.

### 3.   <u>Dangers Not Known to the Government</u>

The third element of the <u>Getz</u> analysis is that the
contractor warned the government about dangers associated with
using the contractor's product which the contractor was aware of
but of which the government was not aware.  654 F.3d at 866.

Buffalo has presented an internal Navy memorandum dated
December 9, 1968 and signed by W.R. Riblett discussing the
hazards of asbestos ("Riblett Memorandum").  [Buffalo Counsel
Decl., Exh. 14 (dkt. no. 58-12), at 2-3.[23]]  Although the Riblett
Memorandum was written outside of the period during which
Plaintiff worked at Pearl Harbor, this Court agrees with the
Removing Defendants that it is relevant as a statement of what
the Navy's understanding about asbestos was up to that point,
including during the period at issue in this case.  The Riblett
Memorandum states, in pertinent part:

> 3.   A survey of the uses of asbestos in
> shipbuilding disclosed that [asbestos] is used
> primarily in two areas.  The first is for packing
> and gaskets and the second is for piping, lagging,

[23] Exhibit 14 includes three of the four enclosures listed
in the Riblett Memorandum and various other materials.  The
Court's citations refer to the page numbers of the exhibit in the
cm/ecf system.

and boiler insulation.  From a health viewpoint, the second area is considered to be the more important. . . .

4.  Enclosure (2) [List of Asbestos Packing and Gasket Specifications] contains a list of asbestos containing packing and gasket materials, together with applicable specification numbers.  All of the asbestos in these items is fabricated as cloth, rope, or compressed sheet with binders, so that the items are not friable when they are cut.  Thus, these items do not cause dust in shipboard applications.  In addition, in many instances, they are received already incorporated in the finished assembly, such as a valve, and do not require fabrication by the shipyard.  For these reasons, packings and gaskets containing asbestos are not considered to be a significant health hazard.

5.  The most important use of asbestos from a health viewpoint is for piping, lagging, and boiler insulation.  Enclosure (3) [MIL-STD-7690] includes the requirements for thermal insulation for machinery and piping.  These requirements include the use of materials other than asbestos. . . .

6.  It should be emphasized that probably the greatest health hazard is caused by airborne asbestos particles during "rip-out" operations, especially on ships built during and shortly after World War II.  Asbestos was widely used during that time.  Although respirators are specified for personnel engaged in these operations, overall control of the dust problem is extremely difficult so that persons in the immediate vicinity may be exposed.

7.  Contact was made with the Industrial Hygienists of Mare Island and Puget Sound Naval Shipyards to discuss this problem.  **It was quite obvious from these discussions that the shipyards have for many years been aware of the hazards of asbestos and have initiated appropriate safety precautions**. . . .

[Id. (some emphases omitted) (underline emphasis handwritten in

original, bold emphasis added).]

Attached to the Riblett Memorandum is a page entitled
"BIMED Analysis of Hazard". [Id. at 4.]  It is a statement
regarding "the hazards associated with the handling and use of
asbestos" written by "Cdr. Rosenwinkel, MC, USN of the Bureau of
Medicine and Surgery, Occupational Health Division." [Id. at 2.]
The BIMED Analysis of Hazard states, in pertinent part:

> The U. S. Navy is well aware of the hazards
> of asbestos to its employees engaged in ship
> construction and ship repair at naval shipyards.
> Hazard control measures implemented by the
> shipyard medical departments and safety divisions
> are in accordance with accepted standards of
> industrial hygiene practices in the U. S. . . .

[Id. at 4.]  The remainder of the BIMED Analysis of Hazard
focuses on the control of airborne asbestos.

Similarly, the CHIL, issued by the Navy's Supply
Systems Command and dated October 1, 1969, lists asbestos fiber –
and no other forms of asbestos – as a hazardous item.  [Forman
Aff., Exh. X (dkt. no. 69-25) at 13.[24]]  The CHIL

> covers items in the Navy Supply System designated
> as hazardous to life and/or property, not
> elsewhere classified or identified by specific
> instructions.
>
> This publication contains (1) identification
> data, (2) labeling data in accordance with MIL-
> STD-755A, and (3) ship stowage requirements in

---

[24] The document's page numbers are virtually unintelligible.
The Court's citation therefore refers to the page number of the
exhibit in the cm/ecf system.  This page contains two pages of
the CHIL, and the asbestos fiber listing is on the second page.

conformance with NAVSHIPS Technical Manual 250-000, Chapter 9300.

[Id. at 3 (FORWARD).]

Buffalo has also presented evidence that "[a]s early as 1922, the Navy recognized . . . the health hazards associated with airborne asbestos dust and the appropriate protective measures to prevent asbestos exposure." [Forman Aff. (dkt. no. 69-1) at ¶ 22.] The Navy also participated in the publication of threshold limits for exposure to asbestos dust in the workplace. [Id. at ¶ 36 (discussing the Navy's participation in the American Conference of Governmental Industrial Hygienists during the second half of the 1940s).] From "the earliest days of the Navy's involvement in industrial hygiene in its facilities and on its vessels[,]" "[t]he Navy[] insiste[d] on autonomy in th[e] area" of "what was best with respect to industrial hygiene in its unique workplaces to carry out its national defense mission." [Id. at ¶¶ 45-46.] Further,

> In the effort to achieve its mission, the Navy made trade-offs between the use of asbestos and the potential health impact on personnel. . . . As knowledge of asbestos health risks evolved, the Navy made sensitive military mission-related decisions about deriving the benefits of asbestos while controlling its risks. Moreover, when the hazards of asbestos became more fully known to the Navy and the scientific community in the late 1960s, the Navy determined not to do an immediate fleet-wide elimination of asbestos. . . .

[Id. at ¶ 33.]

In light of this evidence of the Navy's extensive

66

knowledge of asbestos-related occupational health issues, Buffalo has made a colorable showing that a there were no asbestos hazzards associated with its products which the Navy was unaware of but which Buffalo knew about and failed to disclose to the Navy.  The Court therefore FINDS that Buffalo has made a colorable showing that it can establish the third element of the Getz analysis.

### 4.   Conclusion Regarding Colorable Defense

Viewing the record in light of the liberal standard favoring federal officer removal jurisdiction, *i.e.* in the light most favorable to the Removing Defendants, the Court finds that all of the requirements of the Getz analysis are present in this case.  The Court, however, emphasizes that this is by no means an indication that the Removing Defendants will ultimately prevail on the merits of Plaintiff's claims.

The standard applicable to the instant Motion, however, is not whether the Removing Defendants are likely to succeed on the merits of their government contractor defense.  The issue before this Court is whether at least one of the Removing Defendants has established that it can assert a colorable government contractor defense such that the defendant has the right to have the merits of the defense litigated in federal court.  On that limited issue, in light of the broad interpretation of federal officer removal, this Court finds in

67

favor of the Removing Defendants.  This Court therefore FINDS that at least one of the Removing Defendants has established that it can assert a colorable federal defense.

## IV.  Causal Connection to Actions Pursuant to Federal Direction

The final requirement for federal officer removal jurisdiction is a causal nexus between the defendant's actions, taken pursuant to the direction of a federal officer, and the plaintiff's claims.  Durham, 445 F.3d at 1251.  In order to establish that it acted pursuant to the direction of a federal officer, a defendant must show that

> his or her actions that led to the lawsuit were based on a federal "officer's direct orders or comprehensive and detailed regulations."  Good [v. Armstrong World Indus., Inc.], 914 F. Supp. [1125,] 1128 [(E.D. Pa. 1996)].  That is, it is not enough for a defendant to show that "the relevant acts occurred under the general auspices of a federal officer."  Fung v. Abex Corp., 816 F. Supp. 569, 572 (N.D. Cal. 1992) (internal marks omitted).
>
> Because a defendant's government contractor defense in a failure to warn case is only colorable if the defendant identifies facts demonstrating the government's actions "transcend rubber stamping," Tate [v. Boeing Helicopters], 55 F.3d [1150,] 1157 [(6th Cir. 1995)], any defendant who satisfies the colorable defense requirement will necessarily meet the acting under requirement of Section 1442(a)(1) as well. . . .

Hagen, 739 F. Supp. 2d at 784-85 (some citations omitted).

Further, to establish the causal nexus between a plaintiff's failure to warn claim and a defendant's actions under federal direction, a defendant

68

must "by direct averment exclude the possibility that [the defendant's action] was based on acts or conduct of his not justified by his federal duty." [Mesa, 489 U.S.] at 132, 109 S. Ct. 959 (quoting Maryland v. Soper (No. 1), 270 U.S. 9, 33, 46 S. Ct. 185, 70 L. Ed. 449 (1926)).

. . . [I]t is evident that the causal nexus requirement "is closely related to evidence supporting a colorable federal defense" where a government contractor is the defendant because both elements require the "defendant [to] show that it acted at the federal government's command." [Holdren, 614 F. Supp. 2d at 149.] Indeed, just as the acting under analysis becomes redundant where a defendant in a government contractor case makes out a colorable federal defense, resolving the causal nexus requirement is not difficult in light of the Court's colorability determination because the causal nexus analysis "is essentially the same as [that associated with] the colorable defense requirement." Prewett [v. Goulds Pumps (IPG)], [No. C09-0838 RSM,] 2009 WL 2959877, at *7 [(W.D. Wash. Sept. 9, 2009)].

Id. at 985 (some alterations in Hagen) (footnote omitted).

First, the Court notes that Plaintiff has emphasized that the Navy allowed its manufacturers to use commercial manuals where products manufactured for the Navy were roughly equivalent to commercial products, and that the Removing Defendants' commercial manuals did not include asbestos warnings during the relevant period. Plaintiff therefore argues that the Navy's specifications were not the cause of the Removing Defendants' failure to warn end-users of asbestos hazards. The Court finds that the lack of asbestos warnings in Buffalo's commercial materials is not dispositive. Buffalo has presented evidence that the products it manufactured for the Navy were "custom-

built" and were not "off the shelf". [Kraft Aff. (dkt. no. 58-2) at ¶¶ 9-10.] Mr. Kraft's testimony indicates that Buffalo's products for the Navy had fundamental differences with Buffalo's products for commercial application. [Id. at ¶¶ 9-12.] Thus, the lack of asbestos warnings in Buffalo's commercial materials does not, at this early stage of the litigation, preclude a finding of a causal connection.

This Court has found that at least one of the Removing Defendants has pled sufficient allegations and identified sufficient evidence to raise a colorable government contractor defense. In particular, there was a colorable showing that: the Navy had reasonably precise specifications about technical manuals and labels or markings; the Navy had a back and forth dialogue with its manufacturers regarding warnings and cautions; Buffalo engaged in such an exchange with the Navy; Buffalo's products complied with all of the Navy's specifications, which did not provide for asbestos warnings to end-users;[25] and, in light of the Navy's extensive knowledge about the hazards of asbestos, there were no hazards associated with Buffalo's products which it was aware of but which the Navy was not. In

---

[25] The Court acknowledges that Plaintiff hotly contests the Removing Defendants' position that the Navy's specifications did not allow for asbestos warnings to end-users, but, under the standards applicable to federal officer removal, this is a factual dispute which this Court need not rule upon at this preliminary stage of the case.

light of this showing, the Court also FINDS that at least one of the Removing Defendants has demonstrated a causal nexus between Plaintiff's claims and the actions that it took pursuant to the Navy's directions.

## V.    Summary of Federal Officer Removal Requirements

At least one of the Removing Defendants has established all of the requirements necessary for federal officer removal. This is sufficient to confer jurisdiction over all Defendants, even assuming, *arguendo*, the other Removing Defendants were unable to prove that they were entitled to federal officer removal jurisdiction. See *supra* note 17.   This Court therefore CONCLUDES that removal was proper and that this Court has jurisdiction over the instant case pursuant to 28 U.S.C. § 1442(a)(1).

## CONCLUSION

On the basis of the foregoing, Plaintiff's Motion to Remand, filed November 10, 2011, is HEREBY DENIED.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, April 17, 2012.



        /S/ Leslie E. Kobayashi
        Leslie E. Kobayashi
        United States District Judge

**DAVID M. THOMPSON, JR. V. CRANE COMPANY, ET AL; CIVIL NO. 11-00638 LEK-RLP; ORDER DENYING PLAINTIFF'S MOTION FOR REMAND**

71